640 So.2d 982 (1991)
James Edmund McWILLIAMS
v.
STATE.
6 Div. 190.
Court of Criminal Appeals of Alabama.
August 23, 1991.
Rehearing Denied May 1, 1992.
*986 Al L. Vreeland and Albert S. Miles, Tuscaloosa and Oliver W. Loewy, Montgomery, for appellant.
James H. Evans, Atty. Gen., and Sandra J. Stewart and Jean A. Therkelsen, Asst. Attys. Gen., for appellee.
McMILLAN, Judge.
The appellant was indicted in a four-count indictment on charges of capital murder: counts I and II of the indictment charging the appellant with committing murder during a robbery in the first degree, in violation of § 13A-5-40(a)(2), Code of Alabama 1975; count III charging the commission of murder during rape in the first degree, in violation of § 13A-5-40(a)(3), Code of Alabama 1975; and count IV charging the appellant with committing murder during sodomy in the first degree, in violation of § 13A-5-40(a)(3), Code of Alabama 1975. Subsequently, count IV of the indictment was dismissed. Following the trial, the appellant was found guilty as charged in counts I through III of the indictment, and following a separate sentencing hearing the jury, by a vote of 10 to 2, recommended a verdict of death. Thereafter, the trial court conducted a separate sentencing hearing, following which the appellant was sentenced to death by electrocution.
This court adopts the trial court's specific findings concerning the circumstances of the crime and the appellant's participation therein, as set forth below:
"The defendant, James Edmund McWilliams, Jr., raped, robbed, and murdered Patricia Vallery Reynolds. The crime occurred on December 30, 1984 at Austin's Food Store, Hargrove Road, Tuscaloosa, Alabama.
"Patricia Vallery Reynolds was a clerk at Austin's, a convenience store. The defendant went into the store, locked the front doors, robbed Mrs. Reynolds by taking money from her possession, took her to the back room and brutally raped her, then shot her with a .38 caliber pistol. There were 16 gunshot wounds (8 entrance, 8 exit). She was initially shot while standing, and also shot while lying on the floor. She was shot 6 times, with 2 of the bullets first penetrating her hand or arm before entering and exiting her body. The bullets penetrated both lungs, both hemidiaphragms, *987 the liver, pancreas, stomach, spleen, upper forearms, and hand.
"Mrs. Reynolds died in surgery at 12:40 a.m. The cause of death was exsanguination.
"The defendant was identified by eyewitnesses who placed him at the scene.
"The defendant was apprehended in Findlay, Ohio, driving a stolen car. The murder weapon (also stolen) was in his possession. He was jailed in Ohio, charged with auto theft, possession of stolen property, carrying a concealed weapon, and no operator's license. In the Ohio jail, he bragged to other inmates that he had robbed, raped, and killed a woman in Alabama.
"The jury deliberated less than one hour before returning a verdict of guilty. The following day, the jury recommended the death penalty."

I
The appellant argues that the trial court denied him an individualized determination of the appropriate punishment by refusing to consider his organic brain damage as a mitigating circumstance. The record indicates that, during the penalty stage of his trial before the jury, the appellant presented evidence that he had suffered two head injuries and that he had visited medical professionals as a result of those head injuries. During his sentencing hearing before the trial judge, the appellant presented evidence indicating that he might suffer from some organic brain dysfunction, although, as that court noted, the report suggesting such dysfunction also indicated that the appellant was exaggerating his problems.
The record further reveals that the trial court did consider this mitigating circumstance, but found that it was not supported by the evidence. In his sentencing findings, the trial court first considered the statutory mitigating circumstances, stating in pertinent part:
"This Court finds that the preponderance of the evidence does not show that the defendant was under the influence of extreme mental or emotional disturbance.
"Evidence was presented as to this circumstance during Phase II of this trial, being the punishment phase; however, after consideration of this evidence, this Court finds that the preponderance of the evidence does not show that the defendant was under the influence of extreme mental or emotional disturbance."
Thereafter, in considering the nonstatutory mitigating circumstances presented by the appellant, the trial court stated:
"In addition to the above enumerated mitigating circumstances, the defendant was given the opportunity during the 2nd phase of the trial before the jury returned its advisory verdict to present any other evidence of mitigating circumstances and to make any statement of mitigating circumstances. The defendant testified that he received two blows to the head at various times and places, and this resulted in some organic brain damage.
"Following the verdict of the jury recommending the death penalty, the defendant requested that this Court order neurological and neuropsychological testing, and this request was granted.
"This Court interprets Section 13A-5-47 of the Code of Alabama 1975 as limiting... what additional evidence may be presented in the 3rd phase, the exception being evidence in response to any part of the pre-sentence investigation report which is the subject of factual dispute.
"Nevertheless, the Court reviewed additional evidence presented by the defense as to the result of the neurological and neuropsychological testing of the defendant and other medical records of the defendant made a part of the record from Holman Prison and from Taylor-Hardin Secure Medical Facility, and after a careful review and consideration of these records and reports, the Court finds that the defendant was not and is not psychotic, either from organic brain dysfunction or any other reason. The Court does find that the defendant possibly has some degree of organic brain dysfunction resulting in some physical impairment, but that this does not rise to the level of a mitigating circumstance. The Court finds that the *988 preponderance of the evidence from these tests and reports show the defendant to be feigning, faking, and manipulative.
"The Court further finds that even if this did rise to the level of a mitigating circumstance, the aggravating circumstances would far outweigh this as a mitigating circumstance."
"`It is not required that evidence submitted by the accused as a non-statutory mitigating circumstance be weighed as a mitigating circumstance by the trial judge.' Mikenas v. State, 407 So.2d 892, 893 (Fla. 1981).
"`"Although consideration of all mitigating circumstances is required by the United States Constitution, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the decision of whether a particular mitigating circumstance and sentencing is proven and the weight to be given it rests with the judge and jury. Lucas v. State, 376 So.2d 1149 (Fla.1979)." Smith v. State, 407 So.2d 894, 901 (Fla.1981).'"
Harrell v. State, 470 So.2d 1303, 1308 (Ala. Cr.App.1984), affirmed, 470 So.2d 1309 (Ala. 1985), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
"It is not required that the evidence submitted by the accused as a non-statutory mitigating circumstance be weighed as a mitigating circumstance by the sentencer, in this case, the trial court; although consideration of all mitigating circumstances is required, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Cochran v. State, 500 So.2d 1161 (Ala.Cr.App.1984), affirmed in pertinent part, remanded on other part, 500 So.2d 1179 (Ala.1985), affirmed on return to remand, 500 So.2d 1188 (Ala.Cr.App.), affirmed, 500 So.2d 1064 (Ala.1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987)."
Haney v. State, 603 So.2d 368 (Ala.Cr.App. 1991). See also Bankhead v. State, 585 So.2d 97 (Ala.Cr.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991) ("[w]hile Lockett and its progeny require consideration of all evidence submitted as mitigating, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority").
The trial court clearly found that the evidence presented by the appellant did not rise to the level of a mitigating circumstance. We find no abuse of the trial court's discretion in this regard.

II
The appellant argues that his rights to due process were violated during the penalty phase of his trial, because he was denied the right to the assistance of a psychiatrist. The record indicates that prior to trial the appellant filed a motion requesting a competency examination to determine whether he was sane and whether he was subject to any mental conditions which would bring certain mitigating circumstances into evidence. The trial court granted the motion and ordered a lunacy commission to evaluate the appellant's sanity at the time of the crime, at the time of the evaluation, and as it might relate to any statutory mitigating circumstances. The appellant was evaluated at Taylor-Hardin Secure Medical Facility. Thereafter, during the penalty stage before the jury, the appellant and his mother testified that he had suffered two head injuries that had caused him to seek medical attention. They further testified that his behavior became more destructive and violent following the head injuries. The appellant was also allowed to read into evidence a medical report, which was made by a Dr. Davis prior to the offense, and which indicated that he suffered from an atypical paranoid disorder with schizoid features. The appellant also testified that he had consulted a neurosurgeon about his head injuries, but that the neurosurgeon had told him that the headaches were "not a neurological disorder, that it was probably something that a psychiatrist had to take care of." On rebuttal, the State presented the testimony of Dr. Nagi, one of the lunacy commission psychiatrists who evaluated the appellant at Taylor-Hardin Secure Medical Facility, and Dr. Poythress, a clinical psychologist who was a member of the treatment team that evaluated the appellant. Dr. Nagi testified that the appellant exhibited no symptoms *989 suggestive of head injury when he was at Taylor-Hardin.
After the jury returned an advisory verdict of death, the appellant requested that he be evaluated for possible organic brain damage. The trial court granted the motion, and the appellant was examined by a neuropsychologist, Dr. John Goff. After receiving the neuropsychological report, and prior to his sentence hearing before the trial court, the appellant requested a continuance because he had only two days to review the report. The motion was renewed prior to the trial court's sentencing, defense counsel stating as grounds the late receipt of the report and the inability of defense counsel, as a layman concerning psychological matters, to determine what material from the report, if any, to present with regards to the case. The defense counsel stated that he could not determine whether "the type of diagnosed illness," i.e., organic brain dysfunction, exists. The trial court denied the motion for continuance and told defense counsel to return that afternoon for closing argument and sentencing. After the recess, the trial court stated that it had reviewed the records and the defense counsel again moved for a continuance. The trial court denied the motion, stating: "Well this Court has reviewed the records and this Court finds apparent throughout all the records the following quotes: `No evidence of psychosis; no psychosis; not psychotic; faking; feigning, seen as manipulative; et cetera.' " The trial court then reiterated that it would give defense counsel the opportunity to make a motion to evaluate the reports when court reconvened in the afternoon. The defense counsel replied that he had no time to do that. The report from Dr. Goff was admitted and was considered as mitigating evidence.
The appellant claimed that the psychiatric assistance provided to him was inadequate under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), because the psychiatrists' reports were given to and were used by the State against him and because he was entitled to additional assistance to interpret certain of their reports prior to sentencing. The appellant claims that the State used the testimony of one of the psychiatrists and one of the psychologists who had examined him, after the State had received a report from the lunacy commission, in order to obtain a recommendation of death by the jury. The appellant argues that the use of this testimony violates Smith v. McCormick, 914 F.2d 1153 (9th Cir.1990), which held that Ake v. Oklahoma, supra, precludes a confidential report from an adversarial, i.e. not neutral, psychiatrist from being used against the defendant, unless the appellant calls an expert to testify. The State argues that when the appellant read into evidence the psychiatric report of Dr. Davis, which had been made just prior to the offense, he put his mental status at issue by relying on expert testimony, and thus enabled the State to offer the results of the court-ordered psychological evaluation requested by the appellant. The defense argues, in response, that this expert testimony offered by the State was actually in rebuttal to the lay testimony of the appellant and his mother.
In Buchanan v. Kentucky, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the petitioner attempted to establish at trial the defense of "extreme emotional disturbance," by having a social worker read excerpts from several psychological evaluations of the petitioner that had been made following a previous arrest. On cross-examination, the prosecutor attempted to rebut this defense by having the social worker read excerpts from another evaluation, which had been prepared by a psychiatrist on the joint motion of the petitioner and the prosecution following his arrest in the case at issue. The Supreme Court of Kentucky held that the petitioner had opened the door for the admission of the report by introducing earlier reports that were favorable to him and that the introduction of the latter report did not violate the petitioner's rights under Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).[1] The United States Supreme Court *990 distinguished Estelle v. Smith, supra, noting that the trial court had ordered, sua sponte, the psychiatric examination in that case and that the petitioner had neither asserted an insanity defense nor offered any psychiatric evidence at trial. The Court further stated:
"We thus acknowledge that, in other situations, the State might have an interest in introducing psychiatric evidence to rebut petitioner's defense.
"`When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several Courts of Appeals have held that, under such circumstances, a defendant may be required to submit to a sanity examination conducted by the prosecutor's psychiatrist.' [Estelle v. Smith], at 465 [101 S.Ct. at 1874].
"We further noted: `A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding.' Id., at 468 [101 S.Ct. at 1875]. This statement logically leads to another proposition: if a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution."
Buchanan v. Kentucky, supra, 483 U.S. at 422, 107 S.Ct. at 2917. The Court held that, under the facts of Buchanan v. Kentucky, supra, the introduction of the psychiatrist's report by the prosecution for the limited rebuttal purpose did not violate the Fifth Amendment. The Court further held that the introduction of the report did not violate the petitioner's Sixth Amendment right to the assistance of counsel, because defense counsel was on notice that he intended to put on a "mental status" defense for the petitioner and would therefore "have to anticipate the use of psychological evidence by the prosecution in rebuttal." Buchanan v. Kentucky, supra, 483 U.S. at 425, 107 S.Ct. at 2919. In so holding, the United States Supreme Court also stated, in a footnote, that the petitioner's deterrence argument was without merit. The appellant in the present case makes the same argument. The United States Supreme Court replied to this argument, stating:
"Petitioner contends that, if the use of a pretrial psychological evaluation is allowed, as in this case, defense counsel will be reluctant to request competency evaluations, even if they believe that their clients are in need of one, or they may `sandbag' the trial by raising the competency issue in a post-trial motion.... Moreover, petitioner argues that the rule requiring competency examinations when the trial judge has doubts about the defendant's mental condition, ..., will be undermined by a decision in favor of the Commonwealth.
"While we cannot foresee the tactics of defense counsel, we find somewhat curious petitioner's prediction and proposed solution. Where a competency examination is required ... and where the defendant does not place his mental state at issue, the Fifth and Sixth Amendments would mandate that he be allowed to consult with counsel and be informed of his right to remain silent. We observed in Smith that if, after receiving such advice and warnings, a defendant expresses his desire to refuse to answer any questions, the examination can still proceed `under the condition that the results would be applied solely for that purpose.' [Estelle v. Smith,] 451 U.S., at 468 [101 S.Ct. at 1875]. Thus, where a defendant does not make an issue of his mental condition, we fail to see how the decision today will undermine Pate [v. *991 Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966)]. Where, however, a defendant places his mental status at issue and thus relies upon reports of psychological examinations, he should expect that the results of such reports may be used by the prosecutor in rebuttal."
Buchanan v. Kentucky, supra, at 426, fn. 21, 107 S.Ct. at 2919, fn. 21.
The holding in Ake v. Oklahoma, supra, requires that, if a defendant makes a threshold showing that his sanity is likely to be a significant factor at trial, the State must provide access to a psychiatrist's assistance, if the defendant cannot otherwise afford one. In the present case, the appellant was provided with psychiatric assistance; thus the principle of Ake was not violated. Moreover, because the appellant placed his mental status at issue by reading into evidence the earlier psychiatrist's report, the State could properly rebut this evidence by introducing evidence from the court-ordered psychiatric evaluation. Buchanan v. Kentucky, supra.
Although the appellant argues that he was entitled to additional psychiatric assistance to aid him in evaluating Dr. Goff's report, which was received prior to the trial court's sentencing, the requirements of Ake v. Oklahoma, supra, are met when the State provides the appellant with a competent psychiatrist. The State met this requirement in allowing Dr. Goff to examine the appellant. There is no indication in the record that the appellant could not have called Dr. Goff as a witness to explain his findings or that he even tried to contact the psychiatrist to discuss his findings. Moreover, the trial court indicated that it would have considered a motion to present an expert to evaluate this report. "Although additional psychiatric testimony might have been desirable ... it was not required under the constitution." Magwood v. Smith, 791 F.2d 1438, 1443 (11th Cir.1986).

III
The appellant argues that he was denied the effective assistance of counsel when the trial court refused to give his attorney any time to evaluate the use of the mitigating evidence of organic brain damage, which was disclosed to him "at the last moment."
Despite the appellant's argument to the contrary, there is no indication in the record that the State interfered with the appellant's right to the effective assistance of counsel, by failing to produce all of his medical records from Holman Prison and all of his medical records from Taylor-Hardin Secure Medical Facility sufficiently in advance of his trial or sentencing hearing. The appellant argues that the medical records were not received until after the penalty stage of his trial before the jury and that this delay prejudiced his case. However, as the State argues, the record indicates that the appellant first requested a psychiatric examination by motion filed on January 21, 1985, which motion was granted on January 29, 1986. The psychiatric examination was conducted at Taylor-Hardin Secure Medical Facility over a period from April 2, 1986, to May 29, 1986. The resulting report was filed with the trial court on June 4, 1986, and copies were provided to defense counsel and the State. Defense counsel argues that the appellant filed a subpoena duces tecum, ordering representatives of Taylor-Hardin to produce medical records on June 18, 1986. On July 18, 1986, the appellant filed a motion to have Taylor-Hardin held in contempt for failing to comply. On July 21, 1986, the trial court ordered Taylor-Hardin to produce all its records relevant to the appellant, and this order was complied with on July 25, 1986. Thereafter, the appellant filed a petition to hold Taylor-Hardin in contempt for failing to produce the actual raw test data, and the trial court ordered these documents produced on July 31, 1986. The order was complied with on August 1, 1986. The appellant's trial began on August 20, 1986, and the jury returned with its verdict on August 27, 1986. Either prior to the trial or prior to the sentencing stage before the jury, which occurred on August 28, 1986, the appellant did not request a continuance to obtain further records. Following the penalty stage before the jury, on September 3, 1986, the appellant filed a motion to show cause, alleging that on August 13, 1986, he had served a subpoena duces tecum on Holman Prison requesting that his psychiatric records be produced and *992 that Holman Prison had failed to comply. This subpoena does not appear in the record. On September 3, 1986, the trial court ordered Holman Prison to produce the psychiatric records before October 1, 1986, and also ordered the appellant's neuropsychological examination, which he had requested, and which was completed on October 3, 1986, with a report being filed on October 7, 1986. The appellant was subsequently sentenced on October 9, 1986.
We find no prejudice to the appellant on the basis of any alleged interference by the State, although there is some indication of delays in providing reports. It is clear from the appellant's own testimony during the penalty phase before the jury, that he had long been aware of his head injuries and that he had sought medical evaluation as to the possibility of any organic brain damage based thereon. As he testified, he had been told that he had none. Moreover, the lunacy commission found no indications of any organic brain damage.
Nor did the trial court err in denying the appellant's motion for a continuance in order for the appellant to have additional time to review the neuropsychologist's report and to consult with an expert about the report.
"Applying the principles of the capital case of Ex parte Hays, 518 So.2d 768 (Ala.1986), we find it extremely improbable that the additional time for preparation requested by the defendant would have changed the result of the trial and that the defendant has not met his burden of showing actual prejudice in the defense of the charge for which he was convicted. In Hays, our Supreme Court wrote:
"`Hays contends that the trial court's denial of his motion for continuance, under the facts of this case, denied him his constitutional right to effective assistance of counsel under the Sixth Amendment of the United States Constitution. The Court of Criminal Appeals rejected this argument because Hays failed to show any actual prejudice in the defense of his case as a result of the trial court's denial of his motion. We agree.
"`The United States Supreme Court in Morris v. Slappy, 461 U.S. 1, 11-12, 75 L.Ed.2d 610, 619, 103 S.Ct. 1610, 1616 (1983), recognized that:
"`Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel. See Chambers v. Maroney, 399 U.S. 42, 53-54, 90 S.Ct. 1975, 1982-1983, 26 L.Ed.2d 419 (1970). Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary `insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to assistance of counsel. Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964).
"`See also, Avery v. Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940); Connor v. State, 447 So.2d 860 (Ala.Cr. App.1984). Furthermore, it is evident from recent Supreme Court precedent that, although certain criteria such as the time provided for the investigation and preparation of the case, counsel's experience, the gravity of the charge and complexity of defenses, and counsel's accessibility to witnesses are relevant factors to consider when evaluating effectiveness of counsel, the controlling analysis is whether the action prejudiced the accused in the defense of his or her case. See United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). The accused has the burden of proving prejudice by making a showing that he or she did not receive "a fair trial, a trial whose result is reliable." Strickland v. Washington, 466 U.S. 668 [687], 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). As opined in United States v. Cronic, supra:

"`"The right to the effective assistance of counsel is thus the right of the accused *993 to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted even if defense counsel may have made demonstrable errorsthe kind of testing envisioned by the Sixth Amendment has occurred."
"`466 U.S. at 656, 104 S.Ct. at 2045, 80 L.Ed.2d at 666.' Hays, supra, 518 So.2d at 771-72."
Fortenberry v. Ctate, 545 So.2d 129, 139-40 (Ala.Cr.App.1988), affirmed, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).
In the present case, the appellant has demonstrated no prejudice by the trial court's denial of his motion for continuance. The trial court stated that it had reviewed the report and had found that, while the report indicates that there may have been some indication of organic brain dysfunction, the report also made continual references to the fact that the appellant appeared to be feigning or faking his problems during the examination.

IV
The appellant argues that his right against self-incrimination was violated by the prosecution's presentation of the testimony of the psychiatrist and psychologist who examined him. The appellant cites Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), in support of his argument. However, this argument has been held to be without merit under similar circumstances in Buchanan v. Kentucky, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987). See discussion at part II.

V
The appellant argues that he was denied his constitutional right to confront the authors of the victim impact statements, which were attached to the presentence report, in violation of Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). The appellant argues that, even if the victim impact statements did not violate Booth v. Maryland, supra, they violated Proffitt v. Wainwright, 685 F.2d 1227 (11th Cir.1982), cert. denied, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1985), in that the appellant was not allowed the opportunity to cross-examine the authors of the victim impact statements.
The appellant's argument that the victim impact statements attached to the presentence investigative report, as well as the testimony of the victim's husband and photographs of the victim, were introduced in violation of Booth v. Maryland, supra, is without merit because the United States Supreme Court has recently overruled the applicable holding in Booth v. Maryland, supra, and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). See Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In Payne v. Tennessee, the victim impact statements included testimony by a family member of the victims and comments made by the prosecutor during his arguments to the jury. However, the United States Supreme Court noted that in Booth v. Maryland, a statute that required the presentence report in all felony cases to include a "victim impact statement" describing the effect of the crime on the victim and the victim's family was at issue. The court indicated that the source of these statements was not a distinguishing feature, stating:
"Congress and most of the States have, in recent years, enacted similar legislation to enable the sentencing authority to consider information about the harm caused by the crime committed by the defendant. Evidence involved in the present case was not admitted pursuant to any such enactment, but its purpose and effect was much the same as if it had been. While the admission of this particular kind of evidence designed to portray for the sentencing authority the actual harm caused by a particular crimeis of recent origin, this fact hardly renders it unconstitutional."
In overruling Booth v. Maryland, supra, the United States Supreme Court stated:
"[W]hile virtually no limits are placed on the relevant mitigating evidence a Defendant may introduce concerning his own circumstances, the State is barred from either offering `a glimpse of the life' which *994 a defendant `chose to extinguish,' Mills [v. Maryland], 486 U.S. [367], at 397 [108 S.Ct. 1860 at 1876, 100 L.Ed.2d 384 (1988)] (Rehnquist, C.J., dissenting), or demonstrating the loss of the victim's family and to society which have resulted from the defendant's homicide. Booth reasoned that victim impact evidence must be excluded because it would be difficult, if not impossible, for the defendant to rebut such evidence without shifting the focus of the sentencing hearing away from the defendant, thus creating a `"mini-trial" on the victim's character.' Booth, supra, [482 U.S.] at 506-507 [107 S.Ct. at 2534-2535]. In many cases the evidence relating to the victim is already before the jury at least in part because of its relevance at the guilt phase of the trial. But even as to additional evidence admitted at the sentencing phase, the mere fact that for tactical reasons it might not be prudent for the defense to rebut victim impact evidence makes the case no different than others in which a party is faced with this sort of dilemma. As we explained in rejecting the contention that expert testimony on future dangerousness should be excluded from capital trials, `the rules of evidence generally extant at the federal and state levels anticipate that relevant, unprivileged evidence should be admitted and its weight left to the factfinder, who would have the benefit of cross-examination and contrary evidence by the opposing party.' Barefoot v. Estelle, 463 U.S. 880-898 [103 S.Ct. 3383-3397, 77 L.Ed.2d 1090] (1983).
". . . .
"`Within the constitutional limitations defined by our cases, the States enjoy their traditional latitude to prescribe the method by which those who commit murder should be punished.' Blystone v. Pennsylvania, 494 U.S. 299, 309 [110 S.Ct. 1078, 1084, 108 L.Ed.2d 255] (1990). The States remain free, in capital cases, as well as others, to devise new procedures and new remedies to meet felt needs. Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities. We think the Booth Court was wrong in stating that this kind of evidence leads to the arbitrary imposition of the death penalty. In the majority of cases, and in this case, victim impact evidence serves entirely legitimate purposes. In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of Fourteenth Amendment provides a mechanism for relief. See Darden v. Wainwright, 477 U.S. 168, 179-183 [106 S.Ct. 2464, 2470-2472, 91 L.Ed.2d 144] (1986)."
Payne v. Tennessee, supra, 501 U.S. at 822-825, 111 S.Ct. at 2607-2608.
Moreover, the victim impact statements attached to the pre-sentence investigative report were not inadmissible as hearsay which denied the appellant his right to confrontation.
"It is clear to this Court that the use of the pre-sentencing report is consistent with Ala.Code 1975, § 13A-5-45(d), Alabama's capital murder statute, which states:
"`Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama.'
"The entire report itself is an out-of-court statement and is entirely hearsay; however, it is admissible under Ala.Code 1975, § 13A-5-47. Thompson v. State, [503 So.2d 871 (Ala.Cr.App.1986), affirmed, 503 So.2d 887 (Ala.1987), cert. denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987)]. The trial court is not obligated to do more than provide a fair opportunity for rebuttal; where the record indicates that the defendant was given sufficient opportunity to rebut any hearsay statements made at the sentencing hearing, there is no error. Johnson v. State, 399 So.2d 859 (Ala. *995 Crim.App.1979), aff'd in part and rev'd on other grounds, 399 So.2d 873 (Ala.1979)."
Ex parte Davis, 569 So.2d 738, 741 (Ala. 1990), cert. denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991). "No right to cross-examine was denied, as is contended. Appellant would have been entitled to call, as a witness, any person who could give information about the report, including its author, but apparently chose not to do so." Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991).
The evidence contained in the victim impact statements was relevant to this case, especially in light of Payne v. Tennessee, supra, and the defendant was given an opportunity to rebut the evidence. Therefore, there was no error. See Thompson v. State, supra; Kuenzel v. State, 577 So.2d 474 (Ala. Cr.App.1990), affirmed, 577 So.2d 531 (Ala. 1991).

VI
The appellant argues that his rights to the presumption of innocence and the reliability of the sentencing trial were undermined when a guard provoked an argument with him in front of several jurors, while he was wearing handcuffs. The record indicates that, after the proceedings had ended on one day of the trial and the jury had been escorted out of the courtroom, a confrontation arose between the defendant and a guard who was to escort the defendant back to his cell. The confrontation apparently began in the courtroom and continued into the hall of the courthouse. The appellant was handcuffed by the guard while in they were in the courtroom and he was then led out into the hall, where words were apparently exchanged possibly concerning the appellant's guilt or innocence. On the following morning, the jurors were individually questioned as to what they heard or saw concerning the incident, and whether anything they might have seen or heard would prejudice them against the appellant or the State in any way. Each juror who indicated any sort of awareness of the matter testified that he or she would not be prejudiced against the appellant or the State. Thus, the appellant suffered no actual prejudice.
The appellant cites cases which warn against the prejudicial effect of allowing the jury to view a defendant in shackles or handcuffs during his trial. However, in light of the fact that few jurors polled stated that they saw the appellant in handcuffs, and that those that did stated that it would not prejudice them against the appellant, there was no error.
"`All of the authorities we have studied are agreed that to bring a prisoner before the bar of justice in handcuffs or shackles, where there is no pretense of necessity, is inconsistent with our notion of a fair trial, for it creates in the minds of the jury a prejudice which will likely deter them from deciding the prisoner's fate impartially....'
"Not to be overlooked, is the distinction made in Clark [v. State, 280 Ala. 493, 195 So.2d 786 (1967)], between handcuffing a prisoner in taking him to and from the court and in keeping him in handcuffs while he is being tried, unless there is reasonable ground for belief that such restraint is necessary to prevent his escape or his rescue.
"`Furthermore, it is not ground for a mistrial that an accused felon appear in the presence of the jury in handcuffs when such appearance is only a part of going to and from the courtroom. This is not the same as keeping an accused in shackles and handcuffs while being tried. Rhodes v. State, 34 Ala.App. 481, 41 So.2d 623 [(1949)].' Evans v. State, Ala.Cr.App., 338 So.2d 1033 [1976], cert. denied, 348 So.2d 784 (1977)."
Taylor v. State, 372 So.2d 387, 389 (Ala.Cr. App.1979). See also Cushing v. State, 455 So.2d 119, 121 (Ala.Cr.App.1984) ("[i]t is not ground for a mistrial that the accused appeared before the jury in handcuffs when this appearance was only a part of going to and from the courtroom"). Campbell v. State, 484 So.2d 1168, 1170 (Ala.Cr.App.1985) (wherein the court held that the trial court did not abuse its discretion by allowing the jury to see the defendant restrained in shackles where "[t]here is little doubt that the appellant here had substantial reason to attempt to escape, since he faced a sentence *996 of life without parole ..."). Under the circumstances of this case, and in light of the showing of no actual prejudice, we find no abuse of discretion by the trial court in allowing the appellant to be handcuffed for purposes of going to and from the courtroom.

VII
The appellant argues that the jury instructions concerning the especially heinous, atrocious, or cruel statutory aggravating circumstance violated the Eighth Amendment in that they were too vague to adequately guide the jury. He further argues that this aggravating circumstance was not supported by the facts.
The record indicates that, in defining the aggravating circumstances which the jury could consider in arriving at its advisory verdict, the trial court charged:
"`The capital offense was especially heinous, atrocious, or cruel, compared to other capital offenses.'
"The term `heinous' means especially wicked or shockingly evil. The term `atrocious' means outrageously wicked and violent. The term `cruel' means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of the suffering of others. For a capital offense to be especially heinous or atrocious, any brutality which is involved in it must exceed that which is normally present in any capital offense. For a capital offense to be especially cruel, it must be a consciousless or pitiless crime which is unnecessarily torturous to the victim. All capital offenses are heinous, atrocious and cruel to some extent. What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinousness, atrociousness or cruelty exceeds that which will always exist when a criminal capital case is committed."
These instructions were sufficient to overcome the vagueness condemned in Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (wherein the United States Supreme Court held that the words "especially heinous, atrocious, or cruel," without more, are unconstitutionally vague, as they fail to sufficiently inform juries of what they must find in order to impose the death penalty). See also Lawhorn v. State, 574 So.2d 970 (Ala.Cr.App.1990), affirmed, 581 So.2d 1179 (Ala.1991) (wherein the trial court gave the following instruction to the jury concerning this aggravating circumstance: "[a]nother one that you could consider but is not proven by your verdict is that the capital offense was especially heinous, atrocious, or cruel, compared with other capital offenses as set out in Subdivision 8 defining aggravating circumstances").
However, where sufficient guidance is given to the jury by the trial court's adequately defining the terms used so that the jury is made aware of what it must find in order to impose the death penalty, such an instruction is constitutionally acceptable. See Proffitt v. Florida, 428 U.S. 242, 255-56, 96 S.Ct. 2960, 2968-69, 49 L.Ed.2d 913 (1976). In Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), the appellant challenged a jury instruction concerning this aggravating circumstance, which was similar to the one given in the present case, as unconstitutionally vague. That trial court instructed the jury as follows:
"`The word "heinous" means extremely wicked or shockingly evil. The term "atrocious" means outrageously wicked and vile. The term "cruel" means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of the suffering of others.
"`What is intended to be included in this aggravating circumstance is those cases where the actual commission of a capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses.
"`For a capital offense to be especially heinous or atrocious, any brutality which is involved in it must exceed that which is normally present in any capital offense. For a capital offense to be especially cruel, it must be [a] consciousless or pitiless crime which is unnecessarily torturous to the victim. All capital offenses are heinous, atrocious, and cruel to some extent. What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinousness *997 or atrociousness or cruelty exceeds that which [normally] exists when a capital offense is committed.'"
Id. at 385-86. This court held that these instructions met the constitutional standard and sufficiently overcame the vagueness prohibition of Maynard v. Cartwright, supra. This court held:
"These instructions were proper and furnished adequate guidance to the jury. The court's instructions that this aggravating circumstance should apply to the consciousless or pitiless crime which is unnecessarily tortuous to the victim and one in which the brutality exceeds that which is normally present in any capital offense met the requirements of law. See Proffitt v. Florida, 428 U.S. 242 [96 S.Ct. 2960, 49 L.Ed.2d 913] (1976); Ex parte Kyzer, 399 So.2d 330 (Ala.1981); Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.1989), cert. denied [493 U.S. 945], 110 S.Ct. 354 [107 L.Ed.2d 342] (1989)."
Haney, supra, at 386.
Moreover, the trial court properly instructed the jury on this aggravating circumstance because the evidence presented in this case was sufficient to show its existence. The trial court stated:
"This finding is based upon the evidence of the execution type slaying of the victim, coupled with the number of times the victim was shot, after having been brutally raped and robbed, and done to eliminate an eyewitness to the rape and robbery."
The record indicates that the victim bled to death, after having been shot a number of times while she was standing and then lying on the floor, and after having been raped. Her death did not come for two hours after she had been shot. Witnesses testified that, as she clung to a mop in the back of the Austin's Convenience Store, she stated, "It just hurts so bad," and indicated that she "was burning," was "losing it," and that she was having great difficulty breathing. At the hospital, she begged to see her husband and child because she knew she was going to die. The execution-type slaying in this case, the number of shots fired into the victim, and the nature of the victim's suffering all indicate that an instruction on this aggravating circumstance was appropriate. See, e.g., Lawhorn, supra ("[w]hen a defendant deliberately shoots a victim in the head in a calculated fashion, after the victim has already been rendered helpless by gunshots to the chest, such `extremely wicked or shockingly evil' action may be characterized as especially heinous, atrocious, or cruel"). White v. State, supra ("[e]vidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, and cruel").

VIII
The appellant argues that the jury's general verdict recommending the death penalty, without specifying whether any of the statutory aggravating circumstances were found, violated the Eighth Amendment, because it was not "rationally reviewable." However, jury specification of aggravating and mitigating circumstances is not constitutionally required. See Bush v. State, 431 So.2d 555, 559 (Ala.Cr.App.1982), affirmed, 431 So.2d 563 (Ala.1983), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983); Morrison v. State, 500 So.2d 36, 42 (Ala.Cr.App.1985), affirmed, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987); Rutledge v. State, 482 So.2d 1250, 1259 (Ala.Cr.App. 1983), affirmed in pertinent part and reversed on other grounds, 482 So.2d 1262 (Ala.1984); Whisenhant v. State, 482 So.2d 1225, 1239 (Ala.Cr.App.1982), affirmed in pertinent part and reversed on other grounds, 482 So.2d 1241 (Ala.1983), affirmed on remand, 482 So.2d 1246 (Ala.Cr.App.1983), reversed on other grounds, 482 So.2d 1247 (Ala.1984).

IX
The appellant argues that the trial court erred by denying his challenge for cause against a potential juror, W.G.G., without allowing him to effectively voir dire the juror about his ability to consider mitigating circumstances and to recommend a life sentence in this case. The record indicates that during *998 the voir dire of the jury venire in this case, the defense counsel asked the following:
"[DEFENSE COUNSEL]: ... And if you find that the State has convinced you beyond a reasonable doubt and to a moral certainty that the Defendant, James McWilliams, is guilty of the things charged in this indictment, and no lesser offense that is, he is guilty of a capital crimeif you have found him guilty of that crime, then, there would be a second hearing at which that same jury would hear evidence of aggravating and mitigating circumstances. Now, what I am asking is: If you were to serve on this jury, and if you and the 11 people who were on that jury with you were convinced beyond a reasonable doubt that James McWilliams was guilty of a capital offense, is there any person who feels that automatically a death sentence should be imposed? That is, if he was guilty of a capital offense, then, the death penalty would be imposed? Is there anyone who feels that way? If there is, would you please stand?
"PROSPECTIVE JURORS: W.G.G.; T.W.
"THE COURT: [Defense counsel], since you have gone into that, perhaps you should also tell the jury the other punishment that is available.
"[DEFENSE COUNSEL]: I will get to that. Thank you, Judge.
"OTHER JURORS ALSO RESPONDING: R.B.; A.H.; M.S.; D.F.; J.S.; T.O.; C.S.; W.D.W.; M.F.; R.R.; M.B.; D.B.; W.F.; T.K.
"NO FURTHER RESPONSES.
"[DEFENSE COUNSEL]: Now, the law provides for only two punishments if the Defendant is found guilty. And that is a sentence of death or a sentence of life in prison without parole. Those would be the only two sentences available, if that Defendant is convicted of the capital crime as charged in the indictment. Those of you who stood up and said that you believed that if he was guilty of this crime, he should receive a death sentencethose of you who said thatwould the fact that you had an alternative of a sentence of life without parole, affect your decision? That is, could you give him life without parole if you were convinced, along with 11 others on the jury, that he was guilty of a capital offense? If you could, those of you who stood up would you stand up again?
"PROSPECTIVE JURORS: W.G.G.
"[DEFENSE COUNSEL]: Mr. G:, would you consider that an alternative punishment?
"JUROR GRAMMER: Yes, sir."
Thereafter, several potential jurors were individually voir dired, among them W.G.G. During that questioning, the following occurred when W.G.G. was being examined by the prosecutor:
"[PROSECUTOR]: Mr. G., earlier you were asked the question that if you were serving on the jury and you reached a decision, along with the other members of the jury, that the Defendant was guilty of capital murder, and you indicated that you would impose the death penalty. Let me ask you this: Although in a given case, in this case you might ultimately arrive at your final decision: that being the death penalty, would you consider the evidence, and consider both life without parole and the death penalty before reaching your final decision?
"[W.G.G.]: Yes, sir.
"Q: All right. I believe that's all.
"RE-EXAMINATION BY [DEFENSE COUNSEL]:
"Q: Mr. G., if you and the 11 other jurors found the Defendant guilty of a capital offense: that is, you found in this case, James McWilliams had done what you were talking about that he had been through, shot the girl during the robbery and whatever else the proof might be, `being so bold,' as you would still be able to consider mitigating circumstances and recommend a sentence of life without parole?
"[PROSECUTOR]: We object, Your Honor.
"THE COURT: Sustained.
"Q: Would you be able to recommend a life sentence without parole, as opposed to the death sentence, if you had already found him guilty beyond a reasonable *999 doubt of the things that are alleged in this case?
"[PROSECUTOR]: It is not whether he would recommend that, but whether he would consider the two alternatives?
"THE COURT: Sustained.
"Q: I will accept Your Honor's ruling, and stay on my question. I will stand with the question.
"THE COURT: I don't think so. You are asking him to decide it now.
"[DEFENSE COUNSEL]: I am asking a hypothetical question, if he found the defendant guilty, if he were convinced beyond a reasonable doubt that he had done the things alleged in this indictment that you have heard about, and that we have talked about, are you saying that you could consider mitigating circumstances and recommend a sentence of life without parole? Or do you feel that you would have to recommend the death sentence?
"[PROSECUTOR]: We object on the same grounds. The question is not answerable.
"THE COURT: Sustained.
"[DEFENSE COUNSEL]: We'll except to Your Honor's ruling that we are asking the jury to pre-judge the evidence. I am asking him to pre-judge on a finding of guilt here, Mr. G. There would be 2 punishments available. Can you consider both of them?
"THE WITNESS: Yes, I could.
"Q: I have no further questions."
Thereafter, the defense counsel challenged W.G.G. for cause, stating that he should be able to ask the witness a hypothetical question. The trial court denied the challenge.
This potential juror clearly indicated that he could consider a sentence of life without parole, as well as a death sentence, and that his views on the death penalty would not prevent or substantially impair his duties as a juror. Therefore, the trial court did not abuse his discretion in denying the challenge for cause.
"The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is `whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."' Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648, 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). `The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath notwithstanding his views on capital punishment.' Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proved with `unmistakable clarity' because `juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.' Id.

"A trial judge's finding on whether or not a particular juror is biased `is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.' Witt, 469 U.S. at 429, 105 S.Ct. at 855. That finding must be accorded proper deference on appeal. Id. `A trial court's rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.' Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981)."
Martin v. State, 548 So.2d 488, 490-91 (Ala. Cr.App.1988), affirmed, 548 So.2d 496 (Ala. 1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).
Moreover, the trial court did not err in "limiting" the defense counsel's ability to question the potential juror on voir dire.
"`"In the process of selecting the jury from the venire afforded, each party has the right to have questions formulated by it propounded to the jury, either by the court or by the party as the court may determine, if such questions reasonably relate under the circumstances to the question of the qualification or interest or bias on the part of prospective jurors." Griffin v. State, 383 So.2d 873, 876 (Ala.Cr.App.), cert. denied, 383 So.2d 880 (Ala.1980), *1000 quoted with approval in Alabama Power Co. v. Bonner, 459 So.2d 827, 833 (Ala. 1984).'
"Heath v. State, 480 So.2d 26, 28 (Ala.Cr. App.1985). It is well settled that the trial court has discretion regarding how the voir dire examination of the jury venire will be conducted, and that reversal can be predicated only upon an abuse of that discretion. Ervin v. State, 399 So.2d 894 (Ala. Cr.App.), cert. denied, 399 So.2d 899 (Ala. 1981); Peoples v. State, 375 So.2d 561 (Ala. Cr.App.1979)."
Bui v. State, 551 So.2d 1094, 1110 (Ala.Cr. App.1988), affirmed, 551 So.2d 1125 (Ala. 1989), vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991).
In the present case, the trial court sustained the prosecutor's objection on the ground that the formulation of defense counsel's questions required the potential juror to decide which sentencing alternative he would choose if he found this appellant guilty. The defense counsel was allowed to elicit from the potential juror whether he would consider a sentence of life imprisonment without parole. Therefore, we find no abuse of discretion by the trial court.

X
The appellant argues that the prosecutor undermined the reliability of the jury's advisory verdict because of comments made during his closing argument in the penalty phase before the jury. The appellant cites seven different instances of alleged improper prosecutorial comment.
The first comment by the prosecutor concerned the aggravating circumstances which he claimed to be applicable to the case. He stated that among these circumstances he expected that the trial court would charge "that the capital offense was committed by a person under sentence of imprisonment." He further stated that evidence had been presented that the appellant had been previously convicted on two occasions. The defense counsel objected, noting that "[t]he courts have interpreted that as being a person who was in prison at the time the crime was committed." The trial court sustained defense counsel's objection. The prosecutor then acknowledged, "I am incorrect: the first one [above-quoted aggravating circumstance] is not the applicable one." The appellant did not request a curative instruction and none was given. Thereafter, during its oral charge to the jury, the trial court instructed the jury on the aggravating circumstances which could properly be considered. "`The general rule is that prejudicial statements, even though improper, are considered capable of being eradicated by the trial court in sustaining objections thereto or by appropriate instructions to the jury or both. Meredith v. State, 370 So.2d 1075 (Ala.Crim.App.), cert. denied, 370 So.2d 1079 (Ala.1979).' Bui v. State, 551 So.2d 1094 (Ala.Crim.App. 1988)." Holladay v. State, 549 So.2d 122, 131 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
The appellant also cites a comment made by the prosecutor as he was addressing the applicability of each statutory mitigating circumstance to this case. The prosecutor stated:
"Two, the capital offense was committed while the Defendant was under the influence of extreme mental or emotional disturbance. He has a mental problem in this sense: that he has a mind which is just criminal. He is just bad. What else can you say? He is a dangerous man, and he has proven it."
The appellant argues that, by this comment, the prosecutor argued that the jury could not consider his alleged psychiatric problems. However, it is clear that the prosecutor was arguing that the statutory mitigating circumstance that "[t]he capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance," did not apply to the facts and evidence presented in this case.
The appellant argues that the prosecutor's argument suggested that only statutory mitigating circumstances could be considered by the jury. The appellant bases his argument on the fact that the prosecutor listed the statutory mitigating circumstances and commented on each one. However, in Bankhead v. State, 585 So.2d 97 (Ala.Cr.App. *1001 1989), the prosecutor raised the same argument. This court found no impropriety in the fact that "[i]n closing argument, the State went down the list of statutory mitigating circumstances, contending that none of these applied." Bankhead, supra, at 107.
The record further indicates that following the prosecutor's listing of the statutory mitigating circumstances the defense counsel objected on the basis that the list of statutory circumstances was not inclusive and that other circumstances may be considered. The trial court responded, "Counsel has the right to argue the law, but the Court will be the final authority on the law." The trial court then sustained the appellant's objection. The action of the trial court eradicated any error. See Holladay, supra, at 131, and cases cited therein. Moreover, during his oral charge to the jury, the trial court clearly instructed the jury that nonstatutory mitigating circumstances were to be considered by the jury, as well as the statutory mitigating circumstances. The trial court listed and described the pertinent nonstatutory mitigating circumstances.
The appellant also cites as error the following prosecutorial argument:
"Let me comment on the reasons for penalties, as I see it, or as I think all of you would agree. One reason is to rehabilitate somebody, to change their behavior and make them a good citizen. Is rehabilitation applicable in this case? I submit to you no, it is not. Another one is retribution, just punishment. And I think that society has a need to feel that when a man does the horrible crime that this man has committed, that people out there need to feel and know that the system works, and that the man has been punished to the degree that he can be punished in our society, which, in this case, is the maximum sentence. Another one is deterrent: that is, to deterin other words, the punishment that might be applied to one defendant hopefully will deter others from thinking about committing the same kind of crime. Isn't that applicable in this case?"
Deterrence, retribution, and society's right to self-defense have all been held to be proper subjects of prosecutorial argument. See, e.g., Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App.1987), reversed on other grounds, 523 So.2d 1118 (Ala.1988) ("[i]t is proper to argue deterrence in a sentencing phase closing argument"). Holladay v. State, 549 So.2d 122, 131 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989) (retribution argument was held proper). Kuenzel v. State, supra (argument concerning society's right of self-defense was held proper).
The appellant cites as error the following statements made by the prosecutor:
"Then when he had satisfied that animal lust of his and reached an ejaculation, that is how that happened to be on her slacks.... I am suggesting to you that it is your duty, your obligation under the facts of the evidence in this case, to do that: to carry out your job as it should be done because we have to cut out a cancer sometimes."
As to the prosecutor's reference to the appellant's "animal lust":
"`The prosecutor's statements are not evidence. Henry v. State, 468 So.2d 896, 899 (Ala.Cr.App.1984), cert. denied, 468 So.2d 902 (Ala.1985). Further, prosecutors are to be allowed a wide latitude in their exhortations to the jury. Varner v. State, 418 So.2d 961 (Ala.Cr.App. 1982). "Statements of counsel and argument must be viewed as in the heat of debate and must be valued at their true worth rather than as factors in the formation of the verdict." Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984).'
"Armstrong v. State, 516 So.2d 806, 809 (Ala.Cr.App.1986). Furthermore, `[t]he trial judge can best determine when discussion by counsel is legitimate and when it degenerates into abuse. Garrett v. State, 268 Ala. 299, 105 So.2d 541 (1958); Hurst v. State, 397 So.2d 203 (Ala.Crim. App.), cert. denied, 397 So.2d 208 (Ala. 1981).' Henderson v. State, 460 So.2d 331, 333 (Ala.Cr.App.1984).
"... `[A] prosecutor as well as defense counsel has a right to present his impressions *1002 from the evidence,' and `[h]e may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way.' Watson v. State, 398 So.2d 320, 328 (Ala. Cr.App.1980), writ. denied, 398 So.2d 332 (Ala.1981), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981)."
Henderson v. State, 584 So.2d 841, 856 (Ala. Cr.App.1989), remanded, 584 So.2d 862 (Ala.), affirmed, 587 So.2d 1071 (Ala.Cr.App. 1991).
As to the prosecutor's reference to the appellant as a "cancer that needed to be `cut out'" of society, "the law is clear that `[i]n a proper case, the prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence of the case.'" Pierce v. State, 576 So.2d 236 (Ala.Cr.App.1990), cert. denied, 576 So.2d 258 (Ala.1991), quoting Nicks v. State, 521 So.2d 1018, 1023 (Ala.Cr.App.1987), affirmed, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988).
The appellant contends that the prosecutor erred in arguing that the victim was raped from behind, because, he argues, this fact was not supported by facts introduced into evidence. However, there was evidence that there was semen found on certain places on her slacks, which were still around her lower legs when she was found. Thus, this argument was proper as a reasonable inference to be drawn from the evidence. See Henderson v. State, supra.
The appellant cites three instances in which he claims that the prosecutor injected his personal opinion into the closing argument. The appellant appears to be referring to the prosecutor's comments that society needed protection and that the evidence presented concerning the appellant's mental state indicated not that he was mentally ill, but rather that he was simply mean. This argument was based on the report from the lunacy commission stating that the appellant did not have a mental defect, but rather had a character defect and repercussions from that defect. "`While it is never proper for the prosecutor to express his personal opinion as to the guilt of the accused during closing argument, reversible error does not occur when the argument complained of constituted mere expression of opinion concerning inferences, deductions and conclusions drawn from the evidence.' Sams v. State, 506 So.2d 1027, 1029 (Ala.Cr.App.1986)." Henderson v. State, supra.
In reviewing claims of improper prosecutorial argument, comments made by the prosecutor must be examined in the context of the entire trial. Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990). "In judging a prosecutor's closing argument, the standard is whether the argument `so infected the trial with unfairness as to make the resulting conviction a denial of due process.' Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, [2471] 91 L.Ed.2d 144 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1975)." Bankhead v. State, 585 So.2d 97 (Ala.Cr.App.1989). We find no denial of due process resulting from the prosecutor's comments during his closing statement, nor do we find any error in those comments.

XI
The appellant argues that he was denied his rights to due process by the trial court's refusal to instruct the jury on a lesser included offense of felony murder, because he argues that a rational jury could have found that the robbery was committed by two men and that the appellant was not the triggerman or an accomplice to the murder. However, the evidence presented at trial clearly indicates that the appellant was not entitled to such a charge. There was no reasonable theory which could have been drawn from the evidence to support the appellant's contention that the jury might have concluded that there were two men involved. The appellant bases his argument on the fact that certain of the identifications given by witnesses varied and did not perfectly match the appellant. However, each of these witnesses positively identified the appellant as the man they saw at the time of the offense. The appellant was identified as the man present *1003 during the offense; he was found with the murder weapon in his possession; and the victim's dying declarations clearly indicated that there was only one man involved.[2]
"In Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the United States Supreme Court held that the sentence of death could not be imposed after a jury verdict of guilt of a capital offense when the jury was precluded from considering a verdict of guilt of a lesser included non-capital offense, provided that the evidence would have supported such a verdict. Subsequently, in Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1981), the Supreme Court clarified its decision in Beck, supra, to require that only when the evidence warrants such an instruction must a lesser included offense instruction be given. In so holding, the Court upheld the constitutionality of the following Alabama standard as applied in capital cases: `a lesser included offense instruction should be given if "there is any reasonable theory from the evidence which would support the position." `Hopper, 456 U.S. at 611, 102 S.Ct. at 2053 (quoting Fulghum v. State, 291 Ala. 71, 75, 277 So.2d 886, 890 (1973))."
Ex parte Julius, 455 So.2d 984, 986 (Ala. 1984), cert. denied, 469 U.S. 1132, 105 S.Ct. 817, 83 L.Ed.2d 809 (1985). The appellant was not entitled to a charge on felony murder because there was no reasonable theory from the evidence which would have supported such a charge.

XII
The appellant argues that the prosecutor used inadmissible hearsay testimony concerning Jerry Porter's alibi to disprove the defense theory that the appellant was mistakenly identified as the killer. The record indicates that, shortly following the offense, the police received information incriminating Jerry Porter in the instant offense. Thereafter two of the witnesses to the offense "tentatively identified" Jerry Porter as the man they had seen at the scene of the offense. During the trial, on cross-examination of State's witness Officer Robert McFerrin, the defense counsel asked about any information which had been received regarding Jerry Porter. McFerrin testified that he had received information from an informant that Jerry Porter was seen in the vicinity of Austin's Food Store at approximately 10:00 p.m. on the night of the offense. The informant described Porter as wearing khaki pants, a brown coat, and a white shirt; this description apparently matched the description of the killer which had been run in the local newspaper following the murder. The informant further stated that Porter was carrying a sack of coins and paper money on that night.
On redirect examination, the prosecutor asked Officer McFerrin why no charges had ever been brought against Jerry Porter, and the witness testified that the police discovered that the informant was Porter's ex-girlfriend, who later admitted that she had lied about the identification in order "to get even" with Porter. Officer McFerrin testified that, after investigating Porter, they discovered that he had been in Sylacauga on the night of the murder.
Although the appellant argues that Officer McFerrin's testimony on redirect examination concerning the recanting of the informant's identification of Porter, violated his right of confrontation and was inadmissible hearsay, we note that the appellant "opened the door" for the introduction of this testimony by eliciting testimony from Officer McFerrin as to what the informant had told him concerning Jerry Porter. See Ringer v. State, 489 So.2d 646, 652 (Ala.Cr.App.1986); Loyd v. State, 580 So.2d 1370 (Ala.Cr.App. 1990), reversed on other grounds, 580 So.2d 1374 (Ala.1991); Hollingsworth v. State, 549 So.2d 110 (Ala.Cr.App.1988); Campbell v. State, 508 So.2d 1186 (Ala.Cr.App.1986). See also Garrett v. State, 580 So.2d 58 (Ala.Cr. App.1991) ("[t]he record reveals that the appellant opened these matters up during cross-examination; therefore, they were *1004 properly within the scope of the State's re-direct examination").
Moreover, the appellant failed to object to this testimony at trial and, even if the testimony was hearsay, its admission does not rise to the level of plain error as defined by Rule 45A, A.R.App.P. See Ex parte Womack, 435 So.2d 766, 769 (Ala.1983), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983); Ex parte Harrell, 470 So.2d 1309, 1313 (Ala.1985), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985); Ex parte Watkins, 509 So.2d 1074 (Ala.1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

XIII
The appellant argues that he was denied a fair trial by the prosecutor's impeachment of the appellant's wife, Sonya Smith McWilliams, through an incriminating prior inconsistent statement, without producing the witness to whom the statement was allegedly made. The record indicates that the appellant, his pregnant wife, and their child were staying in the apartment of Cynthia Love at the time of the offense. Cynthia Love had been a good friend of the appellant's wife. On cross-examination of the appellant's wife, the following occurred:
"[PROSECUTOR]: Now, there at the time when you returned the key, I will ask you at that time and place, if you would have made this statement to [Cynthia Love]: that you were on the telephone across from the apartment, and that James [the appellant] went across the street to Austin's Convenience Store. Did you make that statement to Cynthia Love there at that time and place?
"[APPELLANT'S WIFE]: No, I did not."
The appellant did not object to this remark, but later made a motion for mistrial based on the prosecutor's question. The prosecutor submitted that Cynthia Love had been subpoenaed as a State's witness and that she had been reliable in the past. The prosecutor testified that Cynthia Love never appeared to testify and therefore was never called to impeach the appellant's wife. The trial court subsequently instructed the jury as follows:
"Before we begin the arguments of counsel, ladies and gentlemen, I want to give you this instruction: the State has attempted to impeach Sonya Smith McWilliams [the appellant's wife] by showing prior inconsistent statements made to Cynthia Love. Cynthia Love has not testified to those statements, and thus Sonya McWilliams has not been successfully impeached. I instruct you ladies and gentlemen that you cannot consider statements allegedly made to Cynthia Love and denied by Sonya Smith McWilliams in weighing the credibility of Sonya McWilliams."
"It is generally agreed that, when a witness is called to testify to a material issue in the case, the party against whom the witness is called may impeach his credibility by proving that he has previously made statements that are inconsistent with his present testimony. These prior statements of self-contradiction can be introduced either through the cross-examination of the witness or, under limiting rules... by introducing other witnesses who will testify to the inconsistent statement."
C. Gamble, McElroy's Alabama Evidence, § 155.02(1) (4th ed. 1991).
"When a witness, on cross-examination, denies that he made a statement out of court which is inconsistent with his testimony on direct examination, the only available move for the impeaching party is to bring on an impeaching witness who can testify as to the prior inconsistent statement of the witness being impeached."
C. Gamble, McElroy's Alabama Evidence, § 157.01(1) (4th ed. 1991). Although the prosecution laid a proper predicate for the impeachment of the appellant's wife through her prior inconsistent statements made to another witness, because the other witness (Cynthia Love) never testified, the appellant's wife was never impeached.
Moreover, the prosecutor's testimony at trial establishes that he intended to produce the testimony of Cynthia Love. The following transpired following the defense counsel's motion for mistrial:
"[PROSECUTOR]: The witness obviously is not available, Judge, but I was assured *1005 last nightI talked to two people, both of whom claimed to be the mother of Cynthia Love. I think I determined which one was the correct one, and that one told me that she felt very certain that she would be able to have Cynthia here this morning at 9:00. I assured her that we would try to pay her expenses or whatever. There is no way I could know whether she was going to appear here or not. Now, she obviously did not appear. I don't know where she is; she was under subpoena.
"[ASSISTANT PROSECUTOR]: And our impeaching of her was just not done arbitrarily, Your Honor. We had had a statement taken by Ms. Cynthia Love; we have been in contact with Ms. Love, and Ms. Love has been here, was under subpoena, and told that we may need her in rebuttal on these particular facts that were brought out in court. And we did have statements and the things that were offered in impeachment of Mrs. Sonya Smith McWilliams [were] done in good faith. And our witness just didn't pan out, just didn't show up."
"It is becoming increasingly clear that one does not have an unbridled and absolute right to ask about a prior inconsistent statement. Rather, the cross-examiner must have some reasonable grounds and good faith upon which to believe that such a statement was in fact made." C. Gamble, McElroy's Alabama Evidence, § 156.01(7) (4th ed. 1991), citing Wysinger v. State, 448 So.2d 435 (Ala.Cr.App.1983).
Because of Cynthia Love's unavailability, the appellant's wife was not impeached. Also, because she denied having made the statement, any possible prejudice to the appellant was lessened. Moreover, because the prosecutor provided evidence that he undertook the impeachment in good faith and that he had reasonable grounds to believe that Cynthia Love would be present to testify as to the prior inconsistent statement, and also, in light of the trial court's instructions to the jury, we find no prejudice to the appellant as a result of the prosecutor's statements.

XIV
The appellant argues that the trial court interfered with his right to confront his accusers because he was not allowed to impeach an inmate informant by questioning him about his decision to cooperate with the authorities in this case. Two inmates who had been incarcerated with the appellant following his apprehension in Ohio testified for the State, concerning statements which the appellant had allegedly made to them while he was in prison. One of the witnesses, Ronnie Hands, testified on cross-examination as follows:
"When you talked to Investigator Helm and told him you didn't know anything, and you went back and talked to Anthony Finn [the other inmate] did you tell Anthony Finn what they wanted?
"A. I just told him they was asking questions about him.
"Q. About [the appellant]?
"A. Yeah.
"Q. You told Anthony Finn that?
"A. Yeah.
"Q. What else did you tell him?
"A. That's it.
"Q. Did Anthony say he was going to talk to somebody?
"A. He didn't say.
"Q. You and Anthony didn't talk?
"A. Probably. Not really, no.
"Q. And you knew that [the appellant] had come from Alabama? Right?
"A. Well, I didn't know until he told me.
"Q. Well, he told you he had come from Alabama? Right?
"A. Yeah.
"Q. And you got all this information from [the appellant]? Right: that you have testified to?
"A. Yeah.
"Q. And you didn't get any of it from Anthony Finn?
"A. No.
"Q. And you and Anthony Finn never talked about what was said by [the appellant]?
"A. No.

*1006 "Q. You never compared notes about what you knew?
"A. No."
Thereafter, on cross-examination of the other inmate, Anthony Finn, who actually shared a cell with the appellant, the following transpired:
"Q. Did you have occasion to talk with Ronnie Hands about the prosecution wanting some information about [the appellant]?
"A. Yes.
"Q. And when you talked to him, what did he tell you?
"[PROSECUTOR]: We object to hearsay, Your Honor.
"THE COURT: Sustained.
"[DEFENSE COUNSEL]: Your Honor, Mr. Hands testified he never had a conversation.
"[PROSECUTOR]: No, he didn't. He said he did talk to him, Your Honor, and we would object to the nature of any content of any conversation as hearsay.
"[DEFENSE COUNSEL]: Judge, how am I supposed to impeach Mr. Hands, if I don't know what they said?
"THE COURT: I will sustain.
"[DEFENSE COUNSEL]: We except, Your Honor."
The appellant argues that there was evidence that both inmates received lighter sentences because of their cooperation in this case and that, through this questioning, the appellant sought to produce evidence that the two inmates had fabricated their stories so as to receive this beneficial treatment. The appellant argues that the trial court's sustaining of the prosecutor's hearsay objection limited his ability to impeach the inmates. The appellant also argues that the alleged conversation was not hearsay because it was offered for the purpose of impeachment. However, the record indicates that immediately following the trial court's sustaining of the prosecutor's objection and the defense counsel's exception to the trial court's ruling, defense counsel was allowed to ask the following:
"Q. Did you ever talk to Ronnie Hands about the things that [the appellant] said to you or to him?
"A. No.
"Q. You never talked to him about that.
"A. No."
Thus, the defense counsel was allowed to rephrase his question so that it was not as broad, and he received an answer to his question. Therefore, even if the hearsay testimony should have been allowed for the limited purpose of impeachment, any error was harmless, because the defense counsel was allowed to elicit an answer concerning this question. See Walker v. State, 581 So.2d 570 (Ala.Cr.App.1991) (wherein defense counsel's question, which was preliminary step to impeachment, should have been admitted; however, the error was harmless). Moreover, based on the defense counsel's formulation of the initial question we do not find that the trial court abused its discretion in sustaining the prosecutor's objection. See C. Gamble, McElroy's Alabama Evidence § 21.01(1)(3), (4th ed. 1991).

XV
The appellant argues that the trial court denied the appellant the effective assistance of counsel by overruling an objection to the testimony of prison inmates concerning the appellant's confession, without determining whether the inmates were agents of the State. There is no indication in the record that either inmate was working as an agent of the police. There was further evidence that none of the Alabama officials had promised the inmates anything in return for their testimony. However, there was an indication that certain charges were lessened or dropped against these inmates by the Ohio officials in return for their testimony. The record indicates that these arrangements were made after the appellant had been transferred and after he had made the confessions to the inmates.
During the testimony of one of the inmates, defense counsel objected, citing Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Although the trial court overruled the objection, the prosecutor subsequently asked the inmate whether he had coerced or threatened the appellant or had promised anything in return for making *1007 this confession. The inmate stated that he had not.
"`[W]hen an accused volunteers a confession to a person who is not a law enforcement official or agent and has no connection whatever with law enforcement authorities, who has no interest whatever in the prosecution of the accused, is not in a position to promise or give the accused anything to compensate for his confession or to harm him for not making a confession, and there was no occasion whatever on the part of the person to whom the confession was made to have threatened the defendant if he did not confess or to make him any promise if he did confess, the confession under such circumstances is voluntary and admissible in evidence. Ellis v. State, Ala.Cr.App., 338 So.2d 428, 432 (1976); Kircheis v. State, 56 Ala.App. 526, 323 So.2d 412 (1975), cert. denied, 295 Ala. 409, 323 So.2d 421.'
"Primm v. State, 473 So.2d 547, 553 (Ala. Cr.App.1984). See also Warrick v. State, 460 So.2d 320, 323 (Ala.Cr.App.1984); Hinshaw v. State, 398 So.2d 762, 764 (Ala.Cr. App.), cert. denied, 398 So.2d 766 (Ala. 1981)."
Jackson v. State, 502 So.2d 858, 862 (Ala.Cr. App.1986).
Because the statement was voluntarily made to persons who were not law enforcement officers or agents, the appellant was not entitled to counsel or constitutional warnings prior to making his statement. McCall v. State, 501 So.2d 496, 500 (Ala.Cr.App. 1986); Jackson v. State, supra, and cases cited therein.

XVI
The appellant argues that he was denied a fair trial because of improper comments made by the prosecutor during his closing argument at the guilt phase. The appellant refers to the following arguments made by the prosecutor:
"I can assure you, I believe all of us in this room believe that this is real, and the gun in this case, which you have seen, that is real; the slacks which you have seen, that's real, showing the evidence of the sementhat's real; the only thing that is not real here today is Patricia Vallery Reynolds. She is, unfortunately, not here today, our best witness. The only evidence we have of her is her clothing, her key chain, and that picture (indicating). I wish she were here today with her family, and could testify about what happened. But she is not, and that is why we are here."
"Both of them talk about, they keep saying that our witnesses picked out Jerry Porter, and that they identified Jerry Porter. That's not correct, now, and you heard the evidence. They said it looked like him, but none of them said it was him: not a single one of them. They all said yes, that looked very much like him. And when you
"[DEFENSE COUNSEL]: I am going to object to that as a misstatement of the evidence. The evidence was that they the testimony was that they tentatively identified him as the one who was in the store. That was exactly what the officer testified to concerning Mr. McDaniel.
"THE COURT: The jury is aware of the evidence. I will note your objection."
"[PROSECUTOR]: Now, [Defense Counsel] attacked our witnesses: Marsh, Thomas. He talked about the Porter case, and the friends supposedly alibiing. The Tuscaloosa County Homicide Unit investigated that case thoroughly, and they concluded conclusively that that man had nothing to do with it.
"[DEFENSE COUNSEL]: I am going to object. There's no evidence of any conclusive determination by any homicide investigation.
"THE COURT: I will note your objection.
"[DEFENSE COUNSEL]: Could I have a ruling?
"THE COURT: Overruled."
"[PROSECUTOR]: He was going north. Why? Because he was fleeing from the crime; it looked like things were focusing in on him; he was not supposed to have been a suspect until Investigator Rester's card turns up on his door. And he is afraid that now he is a suspect. And the *1008 brown coat, he said, `[w]here is it?' Well, of course, we know that Trooper Elder didn't take the clothing he was wearing. It was cold up in Ohio in January, so he got his clothes back. He had to have gotten those.
"[DEFENSE COUNSEL]: I am going to object to that as not being a correct statement of the evidence, Your Honor.
"THE COURT: Again, the Court doesn't make rulings on the evidence. That is up to the jurors."
"[PROSECUTOR]: And as to what happened to the khaki pants, I don't know. But I suspect they had blood on them. I suspect that he got rid of them."
"All right, sir. And of course as far as printing the gun, this Defendant wasn't even a suspect for several weeks. They didn't know to print the gun. I think it was obvious that Sonya intended to be misleading and untruthful. And that's why I cross-examined her about what she could see from that phone to the apartment. She was trying to tell you that she was there on the phone and could see the door the whole time, and that she could have seen him come and go. But when I showed her obvious physical evidence, she admitted that she was not correct. And as for what Sonya told Chief Miller as to when this Defendant had the gun in Mobile, they were talking about in context of this crime, and
"[DEFENSE COUNSEL]: Your Honor, I am going to object again. There is no evidence as to when that reference was to. I specifically asked Investigator Miller; he said there was no way he knew. I object; that is a misstatement of the evidence.
"[PROSECUTOR]: It is a fair inference.
"THE COURT: The jury is aware of the evidence."
The above-quoted prosecutorial comments were proper inferences or conclusions drawn from the evidence. The prosecutor could properly conclude the victim was dead, that Jerry Porter was never positively identified, that the information pertaining to Jerry Porter had been investigated and that the police had determined that Porter was in Sylacauga on the night of the murder, that the appellant might have gotten rid of the khaki pants and brown coat which he was seen wearing on the night of the offense, and that the appellant's wife was untruthful in testifying that she was able to see the apartment from the telephone booth.
"[PROSECUTOR]: He talked about the fingerprints. You know I didn't hear any mention of Jerry Porter's fingerprints in that story either. You heard the officers say that they rarely ever are able to get prints in a robbery. Certainly they are going to have a lot of prints because people work there day in and day out.
"[DEFENSE COUNSEL]: Your Honor, I object to that as misleading the jury. There is no evidence Jerry Porter's fingerprints were ever sent for comparison.
"THE COURT: Sustained."
As to the prosecutor's comment concerning the lack of evidence of any of Jerry Porter's fingerprints being found in Austin's food store, there was no evidence introduced that any of Jerry Porter's fingerprints were found or even sought out for purposes of comparison. The trial court sustained defense counsel's objection and, although it gave no curative instructions, we do not find that the prosecutor's argument was so unreasonable as to amount to plain error. Dixon v. State, 476 So.2d 1236 (Ala.Cr.App.1985) (prosecutor's argument attempting to inject criminal record of defense witness into evidence was cured by trial court's sustaining of objections and giving instructions to the jury that there was no evidence of prior criminal conduct of the witness). See also Holladay v. State, supra, at 131, quoting Bui v. State, supra (wherein it was held that improper prejudicial statements are generally considered eradicated when the trial court sustains the defendant's objection or gives curative instructions or both).
"[PROSECUTOR]: Now, I submit to you that we have proven beyond a reasonable doubt, the evidence on each of the counts of the indictment that you will have before you. When I talk about reasonable, defense attorneys sometimes would have you believe that that is with certainty. That is not what the law says, and I would ask you *1009 to listen when the Court explains the applicable law to you. Reasonable doubt is simply a doubt for which you can give a good reason: not conjecture, speculation. Sure, you could speculate about all kinds of things, but you should make your decision based only on the evidence that you have heard. The burden of proof in this case is the same in any case when the State has prosecuted. And that burden is overcome every day. Obviously people commit crimes, and people get convicted of them. It is like the Scales of Justice. I know all of you have seen that. We have to balance those scales. It is not overcoming the burden of proof for the State; it is not some impossibility."
"And the people's rights, now, need to be enforced; people have a right to live free from crime and criminals. It is time for you to fulfill your obligation.
"[DEFENSE COUNSEL]: Judge, we are going to object to this line of argument as being illegal [based] on the cases cited by the Eleventh Circuit.
"THE COURT: I will sustain.
"[PROSECUTOR]: All right, sir. I would like to ask you to think about this for a minute. We have talked about all of the witnesses except one. Unfortunately she is not a witness in body. But imagine, if you will, how Patricia Vallery Reynolds felt. You know, we are here in a rather sterile, sometimes it may seem cold atmosphere of the courtroom. But it is abstract: we can sit back and look and see what happens, and think about it, talk about it, and so forth. But the crime happens within the hot lights of violence. And I wonder how she felt that night? The fear
"[DEFENSE COUNSEL]: Your Honor, I am going to object. This is pleading sympathy from the jury; it is not proper, and we do object.
"THE COURT: Sustained."
The prosecutor's comments concerning the jury's obligation and "justice" were proper comments as an appeal by the prosecutor for law enforcement. See e.g. Ex parte Waldrop, 459 So.2d 959, 961-62 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985); Allen v. State, 462 So.2d 1031, 1035 (Ala.Cr.App.1984). The appellant argues that this summation by the prosecutor was a "patently improper emotional appeal"; however, this court has upheld similar comments during a prosecutor's closing. See e.g. Rutledge v. State, 523 So.2d 1087 (Ala. Cr.App.1987), reversed on other grounds, 523 So.2d 1118 (Ala.1988); Lewis v. State, 456 So.2d 413 (Ala.Cr.App.1984).
"[PROSECUTOR]: You know one thing I do note that neither of the defense attorneys have talked about in the evidence or really dwelt on: they did not talk about that gun in that car right beside the man underneath the arm rest, loaded, up in Ohio. And they did not talk about the bullets in his pocket; and they did not talk about the bullets down in the floorboard of the carthe ones he said he was biting on. He said he knew those were there, but he didn't know about the gun being there. Why did he have bullets in his pocket if he didn't know anything about any of this? There is no good reason, explanation, that indicates anything other than guilt in this case. There is no other explanation for it, and you have not heard an explanation; the evidence doesn't show you any other explanation for it."
The appellant objects to the above-quoted comment, alleging it constituted a comment on his failure to testify. No objection was made to this comment at trial.
"`While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.' Ex parte Kennedy, 472 So.2d [1106] at 1111 [(Ala. 1985)] (emphasis in [Kennedy]). `This court has concluded that the failure to object to improper prosecutorial arguments... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.' Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). `Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously *1010 affect the fairness, integrity, and public reputation of the judicial proceedings.' United States v. Butler, 792 F.2d 1528, 1535 (11th Cir.), cert. denied, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986). See also Biddie v. State, 516 So.2d 837, 843 (Ala.Cr.App.1986), reversed on other grounds, 516 So.2d 846 (Ala.1987)."
Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr. App.1990).
"`In evaluating a claim that the prosecutor's statement amounted to a comment on the defendant's failure to testify, "the facts and circumstances of each case must be carefully analyzed to determine whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."' Brinks v. State, 500 So.2d 1311, 1314 (Ala.Crim.App.1986) (quoting McKissick v. United States, 379 F.2d 754, 757 (5th Cir.1976)). See also Marsden v. Moore, 847 F.2d 1536 (11th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); Daly v. State, 442 So.2d 143 (Ala.Crim.App.1983)."
Owen v. State, 586 So.2d 958 (Ala.Cr.App. 1990).
While we are mindful of the similarity between this comment and the prosecutorial comment made in Windsor v. State, 593 So.2d 87 (Ala.Cr.App.1991), in that case, the prosecutor commented, while pointing at the appellant, that "he cannot explain why he had the deceased's pistol in his possession at the time of his arrest." Defense counsel vigorously objected to the comment and noted that the prosecutor had pointed at the defendant or the table at which the defendant was seated when he made this statement. This gesture emphasized the defendant's role as the only and obvious party to properly refute the evidence.
"In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr. App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel and argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984); Sanders v. State, 426 So.2d 497, 509 (Ala. Cr.App.1982)."
Bankhead, supra. See also Duren, supra.
As this court noted in Windsor, supra, the Alabama Supreme Court has indicated that a prosecutor's comment on a defendant's failure to testify is subject to the harmless error rule. Id., citing Ex parte Wilson, 571 So.2d 1251, 1265 (Ala.1990). In light of the prosecutor's entire argument, we do not believe that the comment made in the case was intended to be a reference to the appellant's silence or that the jury "would naturally and necessarily" consider it to be a comment on the appellant's failure to testify. Owen v. State, supra. Moreover, we do not believe that this comment constituted plain error such that "when examined in the context of the entire case, [this error] is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings." United States v. Butler, 792 F.2d 1528, 1535 (11th Cir.), cert. denied, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986).

XVII
The appellant argues that all of the physical evidence which was seized from him by the Ohio police, as well as the statement taken when he was in custody, should have been suppressed because, he argues, this evidence was the fruit of an illegal arrest. The record indicates that an Ohio State Trooper testified at trial that, in the early morning of January 3, 1985, he drove into a rest area, where he observed a parked vehicle, which he noticed because the trunk lock had been punched out. The trooper checked the vehicle's tag number and determined that the vehicle had been reported as stolen, according to a NCIC report. The trooper intended *1011 to wait for other officers to arrive; however, the vehicle's back-up lights came on and the car began to back out of the parking slot. The trooper testified that he then immediately approached the vehicle with his weapon pointed at the appellant, and instructed the appellant to put his hands up. The trooper told the appellant why he was being stopped, and the appellant hesitantly followed the trooper's instructions. The trooper testified that the appellant stated that the vehicle he was in belonged to his uncle and that his uncle had been accompanying him in another vehicle, which had been parked next to him. He told the trooper that his name was Rufus Williams and that he was born on July 7, 1958. When asked how old he was the appellant stated that he was 23 years old; the trooper stated that the dates did not add up properly. The trooper asked for further identification. The appellant stated that he had none and the trooper asked if he carried a wallet. The appellant presented his wallet, and the trooper found a social security card belonging to Anthony G. Crawford, whom the appellant and his wife had visited in Tuscaloosa. The appellant then stated, "I lied to you; that's me. I am not Rufus Williams." The trooper testified that thereafter he performed an administrative inventory search of the vehicle, pursuant to the standard procedure of the Ohio Highway Patrol and, that upon entering the vehicle, he immediately observed a .38 caliber Smith & Wesson handgun underneath the arm-rest. He further found a box of .38 special cartridges and he also found bullets on the appellant's person. The appellant stated that the gun belonged to his uncle.
The basis for the appellant's objection to the arrest is the trooper's report wherein it states that, he "got an NCIC hit on the car, also says he then arrested the defendant. And he then verified that the car was stolen."
The appellant's arrest was proper as the trooper had sufficient probable cause to conduct a warrantless arrest. Although the State seems to argue that the appellant was merely being detained and questioned under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), it is clear that, when the trooper approached with a drawn gun, which he pointed at the appellant, telling him to raise his hands, the appellant was under arrest. See e.g. Jordan v. State, 549 So.2d 161 (Ala.Cr.App.1989). The trooper had sufficient probable cause based on his observation that the "trunk lock was punched," that is, that the trunk lock had been removed, that the vehicle had an Alabama license plate and was present at approximately 2:00 a.m. at a rest area in Ohio and that the file check of the vehicle showed that it was entered into NCIC as stolen. See e.g. Bryant v. City of Gadsden, 574 So.2d 919, 920-21 (Ala.Cr.App.1990) (an officer may rely upon a police radio broadcast to stop and arrest a suspect where the officer also had "`a particularized and objective basis for suspecting the [defendant] of criminal activity.'" Id., quoting Ex parte Betterton, 527 So.2d 747, 749 (Ala.1988)). Therefore, because the appellant's arrest was proper, the evidence seized from the vehicle was taken incident to a lawful arrest, Manning v. State, 568 So.2d 327 (Ala.Cr.App.1990), and subsequent inventory search, and his confession was not to be excluded, because it was not the fruit of an illegal arrest. Williams v. State, 565 So.2d 1233 (Ala.Cr.App.1990).

XVIII
The appellant argues that John Stephens's identification of him should have been suppressed because it was induced by a suggestive lineup. The appellant bases his argument on the fact that John Stephens, a State's witness, picked the appellant out of a photographic array, wherein the appellant states that he was the only suspect who was displayed against a red background and the only suspect who held a plaque under his chin that said "Jefferson County Jail." The record indicates that the appellant's picture was framed during the array, so that only part of the wording, if any, was visible when Stephens viewed it. The record indicates further that the background of the photograph was red, because the photograph was taken at the Jefferson County jail. Furthermore, the record indicates that all of the pictures were distinct in some way, in that some of them had numbers on them, and some of them had height marks behind the individual. The State presented evidence *1012 that no suggestions were made by the police to Stephens as to making his identification.
"It is, first of all, apparent that the primary evil to be avoided is `a very substantial likelihood of irreparable misidentification.' Simmons v. United States, 390 U.S. [377], at 384, 88 S.Ct. 967 [at 971], 19 L.Ed.2d 1247 [1968]. While the phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of `irreparable' it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself. It is the likelihood of misidentification which violates a defendant's right to due process.... Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous."
Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972).
Even if the photographic array could have been said to be unduly suggestive, the in-court identification by Stephens was clearly independently reliable. "`[W]hether eyewitness identification evidence which ensues from a pre-trial identification procedure is constitutionally infirm requires a two-step inquiry. First, it must be determined whether the pre-trial identification procedures were unduly suggestive.... If so, then the suggestiveness of the identification procedures must be balanced against factors indicating that the in-court identification was independently reliable.' Dickerson v. Fogg, 692 F.2d 238, 244 (2d Cir.1982)." Hull v. State, 581 So.2d 1202 (Ala.Cr.App.1990). "In Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972) the United States Supreme Court set out certain factors to be considered in evaluating the reliability of an identification. These factors, as reaffirmed in Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), include `the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.'" Hull v. State, supra. Each case is to be decided pursuant to a totality of the circumstances review. Manson v. Brathwaite, 432 U.S. at 110, 97 S.Ct. at 2251.
In the present case, the record indicates that the witness, John Stephens, lived in the same apartment complex as Cynthia Love and that he spoke to the appellant on two occasions while he was staying at the apartment. He first saw the appellant as he was carrying belongings into the apartment of Cynthia Love. The witness testified that he asked the appellant if he knew Cynthia Love, and that the appellant responded that he did and commended the witness for looking out for her. The witness again spoke to the appellant for a more extended period of time, after the police began investigating the crime. The witness testified that he observed the appellant with another man in a vehicle. He called the appellant over to his apartment and the appellant responded. He informed the appellant that the police had been looking for both the appellant and his wife in connection with the investigation of the offense. The appellant responded that he was concerned for his wife's welfare, with such a criminal on the loose. The witness then attempted to get some beer from the appellant; however, the appellant indicated that he had none. The witness also testified that he observed the appellant, prior to the latter conversation, fumbling with keys and apparently attempting to enter or lock Cynthia Love's apartment. The witness testified that this occurred possibly on the night of the offense. The witness was very specific and accurate in his descriptions of the appellant. It is further evident that the witness identified the appellant with a high level of certainty.
Based on the above, we find that the witness's identification of the appellant was reliable.

XIX
The appellant argues that the identification of him made by witnesses Howard *1013 Marsh, Ronnie Thomas, and Steven McDaniel should have been suppressed because he was denied his right to have retained counsel present when these witnesses identified him in a lineup. The record indicates that these three witnesses all saw the perpetrator of the offense in Austin's food store on the night in question. Thereafter, on February 21, 1985,[3] a preindictment lineup, which included the appellant, took place wherein all three witnesses positively identified him as the man that they had seen in Austin's on the night of the murder. The record indicates that the appellant's court-appointed attorney was present at the lineup. However, at the suppression hearing, the appellant argued that he had retained another attorney to work on his case in addition to his appointed attorney and that he had requested the presence of this attorney at the lineup, but that his request was refused.
However, "[a] defendant does not have a constitutional right to have counsel present at a pre-indictment lineup. Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); Franklin v. State, 424 So.2d 1353 (Ala.Crim.App.1982), cert. denied, 424 So.2d 1353 (Ala.1983); Tankersley v. State, 448 So.2d 486 (Ala.Crim.App.1984); Fisher v. State, 439 So.2d 176 (Ala.Crim. App.), cert. denied, 439 So.2d 176 (Ala.1983)." Johnson v. State, 526 So.2d 34, 38 (Ala.Cr. App.1987). See also Hollingquest v. State, 552 So.2d 1078 (Ala.Cr.App.1989). Moreover, the appellant in fact had counsel present. All three witnesses, furthermore, stated that they were absolutely certain that the appellant was the man that they had seen. The appellant argues that, because two of the witnesses had previously tentatively identified Jerry Porter as the man whom they had seen, their identifications were unreliable. However, the record is clear that these two witnesses' identifications of Porter were in fact tentative, and that they stated that Porter simply looked like the man whom they had seen. Therefore, the trial court properly overruled the appellant's motion to suppress the identification of him made by these three witnesses.

XX
In accordance with § 13A-5-53, Code of Alabama 1975, we have reviewed the record, including the guilt and sentencing proceedings, for any error which adversely affected the rights of the appellant, and we have found none. Nor do we find any evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.
The trial court properly found the existence of three aggravating circumstances: that the appellant had previously been convicted of another felony involving the use or threat of violence to the person, § 13A-5-49(2); that the crime was committed during a robbery and a rape in the first degree, § 13A-5-49(4); and that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, § 13A-5-49(8). The trial court found the existence of no statutory or nonstatutory mitigating circumstances.
After an independent weighing of the aggravating and mitigating circumstances in this case, we find that the evidence supports the trial court's conclusion and indicates that death was the proper sentence. The sentence of death in this case is neither excessive nor disproportionate to the penalties imposed in similar cases, considering both the crime and the defendant. For murder during robbery, see Kuenzel v. State, supra; Henderson v. State, 583 So.2d 276 (Ala.Cr. App.1990), affirmed, 583 So.2d 305 (Ala.1991); Stephens v. State, 580 So.2d 11 (Ala.Cr.App. 1990), affirmed, 580 So.2d 26 (Ala.1991); Tarver v. State, 553 So.2d 631 (Ala.Cr.App.1989), affirmed, 553 So.2d 633 (Ala.1989), cert. denied, 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 966 (1990). For murder during rape in the first degree, see Freeman v. State, 555 So.2d 196 (Ala.Cr.App.1988), affirmed, 555 So.2d 215 (Ala.1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990); Bradley v. State, 494 So.2d 750 (Ala.Cr.App. 1985), affirmed, 494 So.2d 772 (Ala.1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987); Thompson v. State, 542 So.2d 1286 (Ala.Cr.App.1988), affirmed, 542 *1014 So.2d 1300 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989).
Because the appellant's conviction and sentence of death are proper, the judgment of the circuit court is affirmed.
AFFIRMED.
PATTERSON, P.J., and TYSON, McMILLAN, JJ., concur.
BOWEN, J., dissents with opinion, TAYLOR, J., joins in dissent.
BOWEN, Judge, dissenting.
I dissent from Part XVI of the opinion of the majority. The appellant here, like the accused in Windsor v. State, 593 So.2d 87 (Ala.Cr.App.1991), was apprehended after the commission of the capital offense with the murder weapon in his possession. The prosecutor here, like his counterpart in Windsor, reminded the jury that no explanation had been given for the accused's possession of the weapon. The argument in Windsor was as follows:
"[Defense counsel] just glossed over this.... [T]hey can't explain thisthey can't explain why this weapon was in the defendant's pocket when he was arrested. Can you offer me another reasonable hypothesis as to how that weapon got there?"
The argument here was:
"[N]either of the defense attorneys have talked about.... that gun in that car right beside the man underneath the arm rest... and they did not talk about the bullet in his pocket.... Why did he have bullets in his pocket if he didn't know anything about any of this? There is no good reason, explanation, that indicates anything other than guilt in this case. There is no other explanation for it, and you have not heard an explanation; the evidence doesn't show you any other explanation for it."
A "`statement by a prosecuting attorney to the effect that the evidence for the state is uncontradicted or undenied is not a comment on the defendant's failure to testify unless the defendant himself is the only one who can contradict or deny the evidence.' Williams [v. State], 461 So.2d [834] at 843, [(Ala.Cr.App.1983), reversed as to result, Ex parte Williams, 461 So.2d 852 (Ala.1984)]." Stain v. State, 494 So.2d 816, 817 (Ala.Cr. App.1986).
Like the accused in Windsor, the appellant here was the only one who could have explained his possession of the murder weapon. Therefore, the argument here, like the argument in Windsor, constituted an indirect comment on the defendant's failure to testify because the prosecuting attorney "by an indirect reference ... virtually identif[ied] the defendant as the person who did not take the stand." Ex parte Williams, 461 So.2d at 854.
This court reversed the conviction in Windsor, yet the majority affirms here. It justifies the different results in these two cases, decided just four months apart, by noting that in Windsor, (1) the prosecutor "pointed" to the accused when he made the comment, and (2) the defense objected to the comment. Here there was no pointing and no objection. Neither the lack of "pointing" nor the lack of an objection is sufficient to distinguish this case from others, including Windsor, which have been reversed for indirect prosecutorial comments on the accused's failure to testify.
The majority makes too much of the "pointing" in Windsor. That physical gesture was superfluous because the defendant there, just like the appellant here, was the only one who could have been expected to explain his possession of the murder weapon. Under the facts of Windsor (which, for present purposes, are identical here), the prosecutor's words "close[ly] identifi[ed] ... the defendant as the person who did not become a witness." Ex parte Wilson, 571 So.2d 1251, 1261 (Ala.1990). The accompanying gesture added little or nothing to the prosecutor's verbal invitation to hold the accused responsible for failing to refute the State's evidence.
It is true that in both Ex parte Wilson and Windsor v. State, cited in the majority opinion, there were defense objections to the alleged comments on failure to testify. However, both Wilson and Windsor relied on Ex parte Williams, supra, a "plain error" case in which there was no objection to the prohibited *1015 comment. See Williams v. State, 461 So.2d at 843.
Because we found a virtually identical prosecutorial comment to be error in Windsor, there is no question that this comment was error. "`Error' is `plain error' ... when it `has or probably has adversely affected the substantial rights of the [defendant],' Rule 39(k) [and Rule 45A], A.R.App.P., and plain error is to be acted upon `in the same manner as if the defendant's counsel had preserved and raised [the] error for appellate review.' Johnson v. State, 507 So.2d 1351, 1356 (Ala.1986)." Ex parte White, 587 So.2d 1236 (Ala.1991). The error here was "plain" because it affected the rights of this appellant in the same way as the error affected the accused, under very similar circumstances, in Windsor.
I dissent because I believe that if Windsor were correctly decided and should have been reversed, then this conviction should also be reversed.
NOTES
[1] In Estelle v. Smith, supra, the prosecutor called a psychiatrist as the only witness in a capital sentencing hearing. The psychiatrist had examined the petitioner at the request of the trial judge, who had not notified defense counsel about the scope of the examination or apparently even the existence of the examination. Moreover, the petitioner had not placed at issue his competency to stand trial, nor had he offered an insanity defense. The United States Supreme Court held that the petitioner's Fifth Amendment rights were violated by the presentation of this testimony.
[2] There was testimony that, after the victim was found, she stated repeatedly that she did everything that the "son of a bitch" wanted, but that he still shot her. Her statements made at the hospital similarly only indicated one perpetrator.
[3] The appellant was not indicted until May 3, 1985.